189 So.2d 678 (1966)
Jack N. DYER
v.
Alvin J. DAVIS et al.
No. 6713.
Court of Appeal of Louisiana, First Circuit.
July 8, 1966.
Rehearing Denied September 19, 1966.
*679 P. A. Bienvenu, of Bienvenu & Culver, New Orleans, Calvin E. Hardin, Jr., of Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, for appellant.
J. Peyton Parker, Jr., Baton Rouge, for appellees.
Before LOTTINGER, LANDRY, REID, BAILES and LEAR, JJ.
*680 LANDRY, Judge.
This is an appeal from the judgment of the trial court awarding plaintiff, Jack N. Dyer, damages in the sum of $7,500 against defendant, Alvin J. Davis, for an alleged civil libel published during the political campaign in which plaintiff was a candidate for the public office of Insurance Commissioner for the State of Louisiana. Named defendants herein are Alvin J. Davis, Editor in Chief, and certain other parties connected with the publication and circulation of Southern Insurance, a monthly magazine published in the Parish of Orleans, Louisiana (particularly the Parish of East Baton Rouge wherein this action was instituted) and also throughout the United States and in numerous foreign countries.
A devolutive appeal was taken herein by the sole defendant cast. Plaintiff has not appealed the judgment dismissing his action against the remaining defendants consequently the only issue before us is the propriety of the judgment rendered against the lone appellant.
Defendant, a resident of Jefferson Parish, filed exceptions to the jurisdiction of the trial court as well as to the venue and, in addition, tendered exceptions of no right and no cause of action.
Appellant argues the learned trial court erred in: (1) Overruling defendant's exceptions; (2) Failing to follow the rule announced by the Supreme Court of the United States in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (Times), and Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (Garrison); (3) Concluding that the privilege of free expression afforded a citizen under the Constitution of the United States pursuant to the Times and Garrison decisions, supra, does not apply to a candidate for public office; and alternatively, (4) Awarding plaintiff excessive damages.
The publication in question appeared in the December, 1963, issue of Southern Insurance in the form of an editorial containing, inter alia, the following allegedly libelous statements:
"As an alternative, what is there? The coalition of undesirable elements has produced a dud to oppose Dudleyan ignorant man who lets the public think that he is a lawyer, while not even being versed in the elemental insurance law of Louisiana, if his campaigning is any criterion of his program. We talked it over one day with a serious man, and he earnestly concluded: `This is no time for amateurs.' Mr. Guglielmo's opponent is the amateur.
In pre-election promises, Mr. Guglielmo's opponent has bound himself to do what he could not do, even if he wanted to. His ignorance of the law is every bit that exact. This journal bears a distinct dislike for catch-phrasers without sinceritywithout a knowledge of their subject. Any chimpanzee can be taught to rig a wire that will trip an honest citizen. This journal abhors an upstart who'd tinker with the truth."
Defendant's exceptions of no right and no cause of action are based on the premise that plaintiff failed to expressly allege the publication was with "actual malice."
Considering first the exception of no right of action, there can be little doubt it is totally without foundation. It is well settled in our jurisprudence that the exception of no right of action addresses itself to the alleged lack of interest on the part of plaintiff in the subject matter of the litigation. LSA-C.C.P. Article 927; Riche v. Ascension Parish School Board, La.App., 200 So. 681.
Plaintiff having alleged he was libeled by the publication and suffered damages as a result thereof has clearly shown an interest in the subject matter of this litigation, which is his asserted right to *681 damages for the libel which he urges has been committed to his detriment.
Appellant's exception of no cause of action is based on the contention that plaintiff, having failed to allege the purported libel was committed with "actual malice", does not aver a case within the ambit of the Times and Garrison cases, supra, and therefore fails to state a cause of action for which plaintiff may obtain relief in the courts. The trial court, however, overruled defendant's exception of no cause of action on the ground that the cases relied upon by defendant apply only to persons in public office and therefore did not obtain in the present matter which concerns a candidate for public office. In so concluding, we think our learned brother below reached the proper result but on the improper basis.
We note that in Article 9 of his petition, plaintiff alleges a conspiracy between defendants in the publication of the allegedly offensive editorial and in Article 10 avers as a fact that the defamatory nature of the comment was known to defendants. In paragraphs 14 and 16 it is avowed in substance that the alleged conspiracy was deliberate, willful, false and malicious. For the purpose of disposing of the exception of no cause of action, it suffices to state the allegations noted bring the case within the rule of the New York Times decisions, supra, which in effect hold that as regards public officials, to be actionable a libel must be with "actual malice", which means it must be knowingly false or made with reckless disregard of whether it was false or not. The essence of the verbiage chosen by plaintiff to state his case is what determines whether he has in fact stated a cause of action. The language employed in the case at bar in substance charges actual malice in that it alleges a deliberate and willfully false statement, the equivalent of knowingly false. We hold, therefore, the petition states a cause of action in law.
While counsel for appellant re-urges before us the exceptions to the jurisdiction and venue filed below, it is now virtually conceded the said exceptions are in reality only an exception to the venue inasmuch as it is intended to challenge only the right of plaintiff to bring the action in East Baton Rouge Parish. Concurrently with making the aforesaid contention, counsel for defendant acknowledges that the question of venue has been decided adversely to his position by our brethren of the Second Circuit in Walker v. Associated Press, La. App., 162 So.2d 437. In the aforesaid concessions we think counsel quite correct. LSA-C.C.P. Article 74 provides that in an action to recover damages for an offense or quasi-offense, suit may be brought against the defendant in the parish where the wrongful act occurred. Our brethren of the Second Circuit have interpreted the article in question to mean that an action upon an alleged libel may be instituted in any parish wherein the allegedly offensive material is published; this being a recognized exception to our general rule that a defendant must ordinarily be sued in the court of his own domicile. The same result was reached in Vicknair v. Daily States Pub. Co., Limited, 144 La. 809, 81 So. 324, in which the Supreme Court applied the provisions of former Code of Practice Article 165 in a similar situation, the scope of which said Article 165 is not as broad as presently effective LSA-C.C.P. Article 74. We find that defendant's exceptions to the jurisdiction and venue were properly overruled below.
Simply stated, appellant's defense to the merits of the case is that the rule of the Times and Garrison cases, supra, applies with equal force to both public officials and candidates for public office. Extensions of the argument are that pursuant to the rule in question a citizen enjoys the qualified privilege of comment, under the First and Fourteenth Amendments to the United States Constitution, with respect to the qualifications and fitness of a candidate for office as well as an office holder. It *682 is further maintained that the privilege encompasses the right of criticism with respect to the character of a candidate to such extent as his caracter bears upon his fitness and qualification for office. According to defendant, the right of criticism and comment includes discussion of a candidate's personal qualifications, professional skills and so much of even his private life and affairs as bears reasonable relationship to his fitness to serve in a position of public trust. On this basis defendant maintains that according to the Times and Garrison cases, supra, plaintiff, to recover, must establish "actual malice", which means plaintiff bears the burden of showing that the alleged libel was "knowingly false or made with reckless disregard of whether it was false or not." In essence defendant urges that upon becoming a candidate for public office the "character of the whole individual" becomes a proper topic for public examination insofar as the attributes of the "whole man" bears reasonable and legitimate relation to his ability to discharge the duties of his office, if elected.
Plaintiff, contends, however, that the rule of the Times and Garrison cases, supra, is limited by the terms of the decisions to matters of "grave national concern involving public officials" and therefore, is without application herein since we are not concerned here with either a public official or a matter of grave national concern. Plaintiff also contends the rule of the cited federal cases, if applicable, protects the utterer or writer against statements concerning only the official conduct of the office holder or official whereas in the present case the purported libel attacks plaintiff's character as a private individual and impugns his professional ability as an attorney-at-law, neither of which areas come within the rule relied upon by defendant. In addition plaintiff attempts to invoke the Louisiana jurisprudence which allegedly differentiates the instant case from the Times decision, supra. In this latter regard counsel for plaintiff cites and relies upon Madison v. Bolton, 234 La. 997, 102 So.2d 433; Kennedy v. Item Co., 213 La. 347, 34 So.2d 886; Martin v. Markley, 202 La. 291, 11 So.2d 593, and Deshotel v. Thistlethwaite, 240 La. 12, 121 So.2d 222, as authority for the proposition that in Louisiana the privilege of fair comment and criticism is qualified to the extent it is unavailable to a defendant where falsity of the statements are established. Plaintiff also seeks application herein of the Louisiana rule that where falsity is established malice is presumed, again citing the Madison and Kennedy cases, supra.
That the scope of the New York Times case, supra, is equally applicable in both civil and criminal libel cases in the state as well as federal courts is, we believe, manifestly clear from the following language appearing in the Garrison case:
"We held in New York Times that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. The reasons which led us so to hold in New York Times, 376 U.S. at 279-280, 84 S.Ct. at 724-726 [11 L.Ed.2d at 706, 95 A.L.R.2d 1412], apply with no less force merely because the remedy is criminal. The constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy. Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since `* * * erroneous statement is inevitable in free debate, and * * * it must be protected if the freedoms of expression are to have the "breathing space" that they "need * * * to survive" * * *,' 376 U.S., at 271-272, 84 S.Ct. at 721 [11 L.Ed.2d at 701, 95 A.L.R.2d 1412], only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions. *683 For speech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our `profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' New York Times Co. v. Sullivan, 376 U.S., at 270, 84 S.Ct., at 721 [11 L.Ed.2d at 701, 95 A.L.R.2d 1412]."
We believe it equally certain that the Supreme Court of the United States in the New York Times case, supra, clearly indicated its intent to preempt the entire field under discussion and in so doing completely swept aside all state laws and jurisprudence contrary thereto whether related to civil or criminal libel or manifest by the following pronouncement on page 724 of 84 S.Ct., on page 705:
"What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel."
Again on page 725 of 84 S.Ct., on pages 705-706 we find the following pertinent language:
"The state rule of law is not saved by its allowance of the defense of truth. A defense for erroneous statements honestly made is no less essential here than was the requirement of proof of guilty knowledge which, in Smith v. [People of State of] California, 361 U.S. 147, 80 S. Ct. 215, 4 L.Ed.2d 205, we held indispensable to a valid conviction of a bookseller for possessing obscene writings for sale. We said:
`For if the bookseller is criminally liable without knowledge of the contents, * * * he will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature. * * * And the bookseller's burden would become the public's burden, for by restricting him the public's access to reading matter would be restricted. * * * [H]is timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly. The bookseller's self-censorship, compelled by the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered. Through it, the distribution of all books, both obscene and not obscene, would be impeded.' (361 U.S. 147, 153-154, 80 S.Ct. 215, 218, 4 L.Ed.2d 205 [211].)
A rule compelling the critic of official conduct to guarantee the truth of all his factual assertionsand to do so on pain of libel judgments virtually unlimited in amountleads to a comparable `self-censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. See, e. g., Post Publishing Co. v. Hallam, 59 F. 530, 540 (C.A.6th Cir. 1893); see also Noel, Defamation of Public Officers and Candidates, 49 Col. L.Rev. 875, 892 (1949). Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which `steer far wider of the unlawful zone.' Speiser v. Randall, supra, 357 U.S., [513] at 526, 78 S.Ct. [1332] at 1342, 2 L.Ed.2d 1460 [at 1473].

*684 The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments."
The intent of the Times decision to invalidate all state laws and jurisprudence not in harmony therewith was expressly reiterated in the Garrison case, supra, as follows:
"Applying the principles of the New York Times case, we hold that the Louisiana statute, as authoritatively interpreted by the Supreme Court of Louisiana, incorporates constitutionally invalid standards in the context of criticism of the official conduct of public officials. For, contrary to the New York Times rule, which absolutely prohibits punishment of truthful criticism, the statute directs punishment for true statements made with `actual malice,' see LSA-R.S. § 14:48; State v. Cox, 246 La. 748, 756, 167 So.2d 352, 355 (1964), handed down after the New York Times decision; Bennett, The Louisiana Criminal Code, 5 La.L.Rev. 6, 34 (1942). And `actual malice' is defined in the decisions below to mean `hatred, ill will or enmity or a wanton desire to injure * * *.' 244 La. [787] at 851, 154 So.2d [400] at 423. The statute is also unconstitutional as interpreted to cover false statements against public officials. The New York Times standard forbids the punishment of false statements, unless made with knowledge of their falsity or in reckless disregard of whether they are true or false. But the Louisiana statute punishes false statements without regard to that test if made with ill-will; even if ill-will is not established, a false statement concerning public officials can be punished if not made in the reasonable belief of its truth. The Louisiana Supreme Court affirmed the conviction solely on the ground that the evidence sufficed to support the trial court's finding of ill-will, enmity, or a wanton desire to injure. But the trial court also rested the conviction on additional findings that the statement was false and not made in the reasonable belief of its truth. The judge said:
`It is inconceivable to me that the Defendant could have had a reasonable belief, which could be defined as an honest belief, that not one but all eight of these Judges of the Criminal District Court were guilty of what he charged them with in the defamatory statement. These men have been honored * * * with very high offices. * * It is inconceivable to me that all of them could have been guilty of all of the accusations made against them. Therefore, I do not believe that the qualified privilege under LSA-R.S., Title 14, Section 49, is applicable. * * *'
This is not a holding applying the New York Times test. The reasonable-belief standard applied by the trial judge is not the same as the reckless-disregard-of-truth standard. According to the trial court's opinion, a reasonable belief is one which `an ordinarily prudent man might be able to assign a just and fair reason for'; the suggestion is that under this test the immunity from criminal responsibility in the absence of ill-will disappears on proof that the exercise of ordinary care would have revealed that the statement was false. The test which we laid down in New York Times is not keyed to ordinary care; defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth."
The questions of defamation of private character or reputation as distinguished from official conduct and applicability of the rule to candidates for public office as differentiated from office holders, were both considered by the Supreme Court in the Garrison case, supra, and decided adversely to plaintiff's position. In this regard *685 we quote the following from page 217 of 85 S.Ct., page 134 of 13 L.Ed.2d:
"We do not think, however, that appellant's statement may be considered as one constituting only a purely private defamation. The accusation concerned the judges' conduct of the business of the Criminal District Court. Of course, any criticism of the manner in which a public official performs his duties will tend to affect his private, as well as his public, reputation. The New York Times rule is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is harmed. The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character. As the Kansas Supreme Court said in Coleman v. MacLennan, speaking of candidates:
`Manifestly a candidate must surrender to public scrutiny and discussion so much of his private character as affects his fitness for office, and the liberal rule requires no more. But, in measuring the extent of a candidate's profert of character, it should always be remembered that the people have good authority for believing that grapes do not grow on thorns, nor figs on thistles.' 78 Kan. 711, 739, 98 P. 281, 291, 20 L.R.A.,N.S., 361 (1908)."
To hold that the rule applies to the office holder and not to a candidate who may oppose him for the same public office would, in our judgment, constitute a manifest anomaly resulting in a gross inequity. Such a ruling would afford a candidate seeking election a tremendous advantage over his incumbent opponent. Persons seeking public office must perforce do so on an equal basis whether seeking re-election or attempting to gain initial public approval. In either instance the qualifications of the candidates are subject to microscopic public examination, scrutiny and discussion within the bounds of the Times decision, supra, as hereinafter shown. The rule advocated by plaintiff herein would subject the character and reputation of the office holder to the revealing searchlight of public criticism and comment so that his shortcomings, deficiencies and imperfections could be disclosed under the immunity granted by the Times decision while at the same time effectively shielding his adversary from similar exposure. Such we believe to not be in the public interest. It could obviously lead to the election of persons unfit and unqualified for offices of public trust simply because their lack of fitness and qualification could not be explored and made known to the electorate.
We believe the unmistakable import of the Garrison and Times decisions, supra, is to extend the privilege in question equally to criticism or comment concerning a candidate for public office and clothe such comment and criticism with immunity identical to that enjoyed by similar remarks when made relative to a public official. Beyond this, we need consider no further extension of the privilege to decide the case at bar.
Also, the decisions leave absolutely no ground on which it may now be contended the rule is without application to the private character or reputation or professional skill and integrity of a candidate for public office. Nor do we find anything in the decisions indicative of intent to limit or restrict the rule to matters of "grave national concern involving public officials", as argued by counsel for plaintiff, on which basis it is urged the rule is without application because the attack herein was upon plaintiff's private character and professional skill and ability.
*686 The criteria established by the Times decision, supra, is stated as follows:
"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice'that is, with knowledge that it was false or with reckless disregard of whether it was false or not. An oft-cited statement of a like rule, which has been adopted by a number of state courts, is found in the Kansas case of Coleman v. MacLennan, 78 Kan. 711, 98 P. 281 [20 L.R.A.,N.S., 361] (1908). The State Attorney General, a candidate for re-election and a member of the commission charged with the management and control of the state school fund, sued a newspaper publisher for alleged libel in an article purporting to state facts relating to his official conduct in connection with a school-fund transaction. The defendant pleaded privilege and the trial judge, over the plaintiff's objection, instructed the jury that `where an article is published and circulated among voters for the sole purpose of giving what the defendant believes to be truthful information concerning a candidate for public office and for the purpose of enabling such voters to cast their ballot more intelligently, and the whole thing is done in good faith and without malice, the article is privileged, although the principal matters contained in the article may be untrue in fact and derogatory to the character of the plaintiff; and in such a case the burden is on the plaintiff to show actual malice in the publication of the article.'"
And in the Garrison case we find:
"Moreover, even where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood. Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth. Under a rule like the Louisiana rule, permitting a finding of malice based on an intent merely to inflict harm, rather than an intent to inflict harm through falsehood, `it becomes a hazardous matter to speak out against a popular politician, with the result that the dishonest and incompetent will be shielded.' * * *
We held in New York Times that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. * * *"
Applying the foregoing principles to the case at bar we find that the reputedly libelous publication was comment and criticism of plaintiff's personal integrity and professional skill as defendant believed them to be revealed by plaintiff's campaign promises. In this regard defendant explained that plaintiff, being an attorney-at-law is charged with knowing that he was misleading the electorate by making rash campaign promises which plaintiff knew, or should have known, were not within his power to fulfill if elected to the office sought, yet plaintiff was at the same time creating the impression in the minds of the voters that upon election plaintiff would personally institute certain reforms in the insurance laws beneficial to the policy holders. On this issue plaintiff testified that he was merely "advocating" the reforms mentioned and assumed that the public was aware that as Insurance Commissioner he could not personally insure these reforms but only work for their adoption along with the legislative and executive department of the state. The comment in the allegedly offensive article, according to defendant, *687 was merely to point out to the electorate the insincerity of plaintiff's pledges by showing the impossibility of their performance by plaintiff after election. Such comment we believe clearly within the purview of the Times decision. The ability of a candidate to perform and fulfill campaign pledges and promises is a matter properly concerning which the public has a basic right to be fully informed. Sincerity is one of the fundamental characteristics of a candidate considering his possession or lack of such attribute furnishes a vital clue by which his future conduct may be predicated in some reasonable degree in the event of his election.
The serious question in this case, we think, stems from use of language which characterizes plaintiff as "an ignorant man who lets the public think that he is a lawyer, while not even being versed in the elemental insurance law of Louisiana * * *." Plaintiff contends the quoted language constitutes an unwarranted attack on his character as a private individual as well as an unjustified and unwarranted criticism of his professional integrity, skill and ability as a practicing attorney. Standing alone, it is our judgment such language would constitute libel. To call a person "ignorant" and impugn his professional ability and skill, whatever his chosen profession may be, by stating without explanation or qualification that he pretends to be a member of any given profession, with the intent to create the impression the party is an imposter when he was in fact not so, in our view, transcends the bounds of permissible comment and criticism even beyond the admittedly liberal rule of the Times case, supra. However, the article about which plaintiff complains must be taken in its entirety, and read as a whole, it is clear that defendant was not merely referring to plaintiff as being unqualifiedly ignorant solely for the sake of utilizing such an epithet but rather the charge of ignorance was conditioned and qualified by language indicating its foundation rested upon campaign promises which could not be fulfilled under existing law. The same is true with respect to the language indicating plaintiff permitted himself to be thought of by the public as a lawyer. In the light of the entire editorial, the language does not charge plaintiff with being an imposter to the legal profession solely to belittle, abuse or expose plaintiff to ridicule. It does, we believe, question plaintiff's legal ability for reasons expressly set forth, namely, plaintiff's alleged failure to know or properly understand the state's insurance laws because of his having made promises and pledges impossible to fulfill. Such comment we believe within the realm of permissibility encompassed by the Times decision which holds that statements free of malice and circulated for the sole purpose of giving what the defendant believes to be truthful information concerning a candidate for office and for the purpose of enlightening the voters so that they may cast their ballots more intelligently, are privileged although they are untrue and in fact derogatory; in such cases the burden is upon plaintiff to prove actual malice.
We find nothing in the record before us to substantiate the charge of actual malice. Plaintiff concedes he has no proof of actual malice and defendant's testimony is to the effect he published the article in question believing it to be true because, in his opinion, plaintiff's campaign promises and pledges revealed a lack of knowledge of the insurance laws of the state which circumstance defendant considered reasonably related to plaintiff's qualification and fitness for the office of Insurance Commissioner. Defendant further explained he was not personally acquainted with plaintiff but that in his view, plaintiff's campaign literature showed an insincerity based either on misinformation or lack of knowledge and he believed the public had a right to be so informed.
The state jurisprudence relied upon by plaintiff herein has, we believe, been clearly superceded by the holding in the Times and Garrison cases, supra, pursuant to which plaintiff must prove actual malice. *688 The Louisiana rule that malice is presumed upon proof of a false statement must yield to the federal rule which holds that not only must the statement be false but also it must be knowingly false or made with reckless disregard of whether it was false or not.
Plaintiff having failed to discharge the onus incumbent upon him, the judgment of the trial court must be reversed.
Accordingly, it is ordered, adjudged and decreed the judgment of the trial court in favor of plaintiff, Jack N. Dyer, and against defendant, Alvin J. Davis, Jr., be and the same is hereby annulled, reversed and set aside and judgment rendered herein in favor of said defendant rejecting said plaintiff's demands at plaintiff's cost.
Reversed and rendered.
LEAR, Judge (dissenting).
I hereby respectfully dissent from the majority opinion herein.
Just as freedom of expression and speech does not justify the false cry of "Fire" in a crowded theater, the doctrine of Times and Garrison does not justify "the intent to inflict harm through falsehood", even though the person intended to be harmed is a public official and even though the libelous falsehood is attempted to be insulated from action by coupling it with references to the officials' public acts and policies. See Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965).
The test of actual malice, as set forth in Times and Garrison, is correctly repeated in the majority opinion. That is, if the libel is uttered when it is known to be false or if it is uttered with reckless disregard of whether it was false or not, then the utterance is actionable.
The Supreme Court of the United States did not reverse in the Times case on any theory of privilege or even on a theory of freedom of expression. As is clearly pointed out in their decision, they noted that Alabama law required a showing of actual malice for the granting of punitive damages, though it presumed malice for the granting of compensatory damages. The award was in globo, with no division between the compensatory and punitive amounts. Inasmuch as the newly announced Federal rule did not allow the presumption of malice, it could not allow the award for general damages and it inevitably followed that the entire award had to be upset.
The majority cite from the Garrison case as follows:
"The First and Fourteenth Amendments embody our `profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' New York Times Co. v. Sullivan, 376 U.S., at 270, 84 S.Ct., at 721 [11 L.Ed.2d at 701, 95 A.L.R.2d 1412]."
I agree. However, under Times, Garrison and Henry, the vehement, caustic, and unpleasantly sharp attacks cannot be, in addition, false if the utterer or writer knows them to be false or if he utters or writes the attacks with "reckless disregard of their falsity."
Defendant accused petitioner of being "an ignorant man who lets the public think that he is a lawyer, while not even being versed in the elemental insurance law of Louisiana, if his campaigning is any criterion of his program". (Emphasis supplied.)
The operative word in this publication is the word "even". It was clearly the intent of the publisher of this statement to imply that a person who did not even know insurance law did not know any other phase of the law. This implication is strengthened by the introduction which states that plaintiff "lets the public think that he is a lawyer."
*689 The implanting of the thought of petitioner's ignorance is brought to further fruition by the subsequent statement: "His ignorance of the law is every bit that exact." Here, again, is the charge that Mr. Dyer is entirely ignorant of the whole corpus juris.
This was false. It was knowingly false to defendant who knew that plaintiff enjoyed the status of attorney. It was a false libel not only on petitioner, but also on the members of our Supreme Court who passed upon petitioner's learning and qualification and who admitted him to practice.
In Times, the U. S. Supreme Court cited with approval an instruction given by a Kansas court (Coleman v. MacLennan, 78 Kan. 711, 98 P. 281, 20 L.R.A.,N.S., 361 (1908), as follows:
"* * * where an article is published and circulated among voters for the sole purpose of giving what the defendant believes to be truthful information concerning a candidate for public office and for the purpose of enabling such voters to cast their ballot more intelligently, and the whole thing is done in good faith and without malice, the article is privileged, although the principal matters contained in the article may be untrue in fact and derogatory to the character of the plaintiff; and in such a case the burden is on the plaintiff to show actual malice in the publication of the article."
Conceding this is the law we must apply here, I differ from the majority in that I do not think defendant's statements to be that which he "believes to be truthful information concerning a candidate for public office and for the purpose of enabling such voters to cast their ballot more intelligently, and the whole thing is done in good faith and without malice."
The observations of the Supreme Court in Times as to the necessity of a broad privilege in commenting on our public officers and candidates is a praiseworthy expression of the necessity for maintaining wide latitude in our freedom of speech and expression.
However, the obverse of the coin is equally true. If our officials and candidates are not protected to some extent from vituperative lies that are known to be lies by those who initiate and repeat them, we soon shan't have officials and candidates who embody any personal dignity or sensitivity. This would be a tragedy equal in import with a restriction on freedom of speech and press.
I respectfully dissent.
Rehearing denied.
LEAR, J., dissents from refusal to grant a rehearing.